**LITTON SYSTEMS, INC., Appellee,**

v.

**WHIRLPOOL CORPORATION, Appellant.**

**Appeal No. 83–1004.**

United States Court of Appeals, Federal Circuit.

Feb. 14, 1984.

---

Dugald S. McDougall, Chicago, Ill., argued, for appellant; Michael R. Cunningham, Minneapolis, Minn., of counsel, Gene A. Heth and Robert O. Rice, Benton Harbor, Mich., of counsel.

John D. Gould, Minneapolis, Minn., argued for appellee; with him on brief, was Earl D. Reiland, Minneapolis, Minn., Robert E. Lowe, Minneapolis, Minn., of counsel.

Before KASHIWA, Circuit Judge, NICHOLS, Senior Circuit Judge, and BENNETT, Circuit Judge.

NICHOLS, Senior Circuit Judge.

This is an appeal from a judgment entered on April 28, 1983, in which the United States District Court for the District of Minnesota, after a bench trial, held valid a United States utility patent and a United States design patent, both owned by Litton Systems. The district court also found that certain microwave ovens manufactured and sold by Whirlpool Corporation infringe these two patents, bear a false designation of origin as prohibited by Section 43(a) of the Trademark Act of 1946, 15 U.S.C. § 1125–(a) (1982), and by the Minnesota Uniform Deceptive Trade Practices Act, Minn.Stat.Ann. §§ 325D.43–.48 (West 1982), and unfairly compete with microwave ovens manufactured and sold by Litton Systems. The district court further held that Whirlpool Corporation's acts have caused damage to Litton Systems and the court enjoined Whirlpool Corporation from future infringement of Litton System's rights. Whirlpool's appeal involves only questions of liability. There has not been any decision as to accounting, but we have jurisdiction under 28 U.S.C. § 1292(c)(1) (1982). We conclude that the Litton utility patent is invalid, the Litton design patent is valid but not infringed, Whirlpool has not violated 15 U.S.C. § 1125(a), and Litton's

state causes of action are not maintainable. Therefore, we reverse in part and affirm in part. Our holding as to invalidity of the utility patent turns on our holding that a product embodying the invention was on sale more than one year before the patent application's filing date, when such date is correctly determined.

## I

### Background

Plaintiff-appellee Litton Systems, Inc. ("Litton"), a Delaware corporation having headquarters at Minneapolis, Minnesota, brought this action against defendant-appellant Whirlpool Corporation ("Whirlpool"), a Delaware corporation with headquarters in Benton Harbor, Michigan. Litton alleged that certain Whirlpool microwave ovens infringed two patents which Litton owns: U.S. Patent No. 3,843,859 ("the '859 patent") entitled "Microwave Oven Door Assembly"; and U.S. Design Patent No. D–226,990 ("the '990 patent"), entitled "Microwave Oven," and covering the appearance of Litton's 400-Series microwave ovens. Litton also made unfair competition claims which relate closely to its design patent infringement claim and which are premised on Whirlpool's alleged copying of the overall exterior product configuration of the Litton ovens. Litton contends that the Whirlpool ovens, which it believes copy the "Litton look," are likely to confuse, as to source, prospective purchasers of Litton microwave ovens.

Whirlpool denied at trial that it infringed either of Litton's patents, but has not argued the matter of infringement with respect to the '859 patent here. Whirlpool also contended that Litton's two patents were invalid for a number of reasons: the '859 patent because of obvious subject matter, fatal defects in Litton's Patent Office prosecution, actual invention by one not named in the patent, and fraud on the Patent Office in concealing from it the existence of an adverse claim; the '990 patent due to its obviousness in light of prior art. Finally, Whirlpool denied that it unfairly competed with Litton, arguing not only that it did not copy the appearance of Litton's ovens, but that since there is no "secondary meaning" in any of the nonfunctional features of Litton's ovens, there can be no confusion or likelihood of confusion between the Whirlpool and Litton ovens. This action was filed in 1977; four trial judges (and a magistrate) and a monumental record later, the trial court held for Litton on all counts, and enjoined Whirlpool from further infringement of Litton's rights.

### A. The Relationship of the Parties.

Litton, a large, diversified company, makes a wide range of products which, through the 1960's, it sold to the armed forces and to industrial customers. These products included microwave ovens for sale to commercial purchasers such as restaurants and schools.

In 1969, Litton began selling microwave ovens for home use. Litton, which had never before marketed to consumers at retail, needed a distribution system through which it could reach the consuming public. In 1970, Litton entered into arrangements for the wholesale distribution of its microwave ovens with a number of Whirlpool's independent distributors and with some of Whirlpool's company-owned branches as well. Whirlpool, not then selling microwave ovens itself, had no objection to sharing its distribution facilities with Litton. It warned Litton, however, that Whirlpool might introduce its own line of microwave ovens in the future.

In 1972, Litton brought on the market the first models of its new 400-Series countertop microwave ovens. Litton marketed these ovens under its own brand name, "Litton." The 400-Series, intended for consumer use, met with good public acceptance. In order to protect the exterior design of the 400-Series oven, Litton, this same year, applied for and received the '990 design patent.

In large part due to the success of the 400-Series ovens, a number of other companies, including Sears and Whirlpool, in-

quired of Litton whether it would sell its 400-Series on a "private label" basis. Litton rejected all save one of these requests, but sold several thousand of its 400-Series ovens to McGraw-Edison Company for resale to the public in appliance stores and other retail outlets under the brand name "Modern Maid." The Modern Maid ovens were virtually identical to the 400-Series ovens. On their face, moreover, these Modern Maid ovens had no indication as to their Litton origin. The parties dispute, however, whether these ovens bore any notification anywhere of Litton manufacture.

About November 1973, Whirlpool began to develop its own line of countertop microwave ovens. A group of Whirlpool engineers undertook the mechanical and electrical development work on the new product. Litton's own Microwave Tube Division acted as technical consultant.

Whirlpool assigned the duties of creating its microwave oven's aesthetic design to Sundberg-Ferar, Inc., a well-known firm of industrial designers. Sundberg-Ferar's designers hoped to give the Whirlpool microwave oven a competitive, "contemporary" exterior design. They "comparison shopped" to acquaint themselves with the better-selling microwave ovens then on the market. In the course of their research, Sundberg-Ferar acquired from Whirlpool, and studied, a product specification sheet for the Litton model 416 oven.

The *raison d'etre* for this case is clear. Although other companies were manufacturing microwave ovens with a similar general "modernistic" appearance (noticeably Admiral and Roper), Litton worried most about Whirlpool's competition. Litton's past-president of its Microwave Cooking Products Division, for example, expressed Litton's great concern that Whirlpool would attempt to have the microwave oven distributors which Litton and Whirlpool had in common "sell Whirlpool and perhaps drop the Litton line."

Litton had, in fact, a well-grounded fear. Whirlpool, which considered its proposed countertop microwave oven a "me too" product to the Litton 400-Series ovens, regarded it critically important to "recapture" its former distributors with its own Whirlpool microwave oven line. ("[One of our] most important chores is to wean our distributors away from Litton." Whirlpool memo of April 1977.) To recapture its distributors, Whirlpool intended to put out a microwave oven which would directly compete with the Litton ovens. Numerous Whirlpool memoranda within the trial record discuss Litton and the Litton microwave oven. Some examples include: a memo of February 1974 in which Whirlpool states that "[s]ales indicated a need for two (2) countertop microwave ovens comperable [sic] to Litton's 200 & 400 series, * * *;" a memo of June 1975 in which Whirlpool expressed concern that "the interior cavity of our microwave gave the illusion of being much smaller than the Litton due to the design of the cover on the mixer;" and a memo of February 1976 in which Whirlpool stated that it would "offer 3 models in January, 1977, and a probe model within 60 days. Exactly what Litton offers our distributors today."

Whirlpool introduced its countertop microwave oven to the public in January 1977. Litton brought this action in July 1977. Since one picture is worth a thousand words, rather than attempt to describe microwave ovens then on the market, we provide photographs of several on the next few pages. In examining these photographs, the reader should pay particular attention to the shape of the doors, the layout of the control panels, and the location and type of manufacturer's identification.

WHIRLPOOL Model 7600 Oven (PX–36)

LITTON Model 419 Oven (PX–133)

ADMIRAL 1976 Model Oven (DX–127)

ROPER 1976 Model Oven (DX–126)

AMANA Oven (PX–131)

GENERAL ELECTRIC Oven (PX–132)

---

### B. *Microwave Oven Doors*

The utility patent in suit, '859, covers a single, but important, component of a microwave oven, the door. One of the problems facing microwave oven engineers ever since the introduction of such ovens has been the design and construction of an effective microwave oven door assembly. Such an assembly must do much more than the door of a conventional convection oven. It must provide an effective barrier to the transmission of microwaves and therefore maintain a reliable seal around the joint between the door assembly and the oven cavity so as to seal microwave energy within the cooking cavity. It must also resist deterioration and corrosion and be readily cleanable in the food preparation environment, be durable and capable of withstanding substantial impacts, have a portion which is visibly transparent so that a user can observe cooking, and be economical to produce.

The invention disclosed in the '859 patent, entitled "Microwave Oven Door Assembly," meets many of these requirements. In its preferred form, the invention is a laminate (*i.e.,* layered) microwave oven door assembly which consists of a central layer of a perforated 20-mil aluminum metal sheet (*i.e.,* a sheet twenty one-thousandths of an inch thick, with holes), sandwiched between two layers: a front glass panel and a rear panel made of either glass or plastic. The three layers are bonded together with an adhesive (*e.g.,* glue) located around the layers' edges, or spread over each layer's whole surface.

At the time the invention described in the '859 patent was made, a worker skilled in the microwave oven art had at hand an extensive body of prior art depicting three-

layer laminated door assemblies in which front and back layers of glass or plastic sandwiched a central layer of perforated or transparent metal shield. These early microwave oven doors exhibited several shortcomings, however. The main difficulty lay in how to fasten the three layers together. The tolerance buildup in uniting the three panels, and the many pieces involved in the mechanical fasteners then used, made assembly of microwave doors quite complex and cumbersome. Microwave engineers devised elaborate Rube-Goldberg-type contraptions to reduce the gap between the door and the oven cavity front. Many pieces were involved because the viewing window was contained within frames which were made of separate pieces. Other problems included possible warping in assembly, poor aesthetics, electrical arcing, and high cost.

The '859 patent discloses, as its main contribution to the microwave oven art, the use of adhesive to bond the three layers together rather than the use of mechanical fasteners. The rigidity of the glass panel permits minimum gap tolerance between the door assembly and oven front face at the cavity edges. The use of a glass-supported sheet of metal, extending across the entire opening of the oven and surrounding front face, solved both the gap tolerance and leakage problems, while eliminating frames as separate parts.

Litton's use of the invention described in the '859 patent saved it approximately 10 dollars per door unit. Litton saved nearly two million dollars in 1974 alone, the year Whirlpool began to develop its own microwave ovens.

C. *The '859 Utility Patent—Patent Office Procedure*

Litton filed its original patent application, with 11 claims, on September 27, 1972. It named, as joint inventors, Eldon J. Klemp and Vernon E. Cassibo. After two office actions and a final rejection, Litton filed an application for a Rule 60 continuation, on July 26, 1973, pursuant to 37 C.F.R. § 1.60. This application utilized an exact copy of the original application's specification, drawings and inventors' declaration, as is normal practice for a continuation application. Litton submitted with the continuation application a preliminary amendment in which it altered the original Claims 1 and 7 to specify, among other things, that the claimed microwave oven door assembly included "a relatively thin sheet of self-supporting, shatterproof metal." Although Litton's parent application previously disclosed a "thin" 20-mil sheet of metal, Litton never expressly limited the metal's qualities to "self-supporting" or "shatterproof."

On January 8, 1974, the then Patent Office (now the Patent and Trademark Office, both hereafter referred to as the "PTO") acted on Litton's Rule 60 continuation application. The PTO rejected Litton's claims as unpatentable under both 35 U.S.C. §§ 102 and 103. The sole reference cited was Haagensen, U.S. Patent No. 2,920,174. The PTO also rejected Litton's claims under 35 U.S.C. § 112, on the basis that the specification provided no support for the new terms "self-supporting" and "shatterproof."

Litton thereafter filed an amendment, on March 13, 1974, seeking to insert into the Rule 60 continuation application's specification recitals that characterized the 20-mil metal sheet as "self-supporting" and "shatterproof." Litton intended these recitals to support its use of those words in the claims, arguing, in its accompanying remarks, that the words "shatterproof" and "self-supporting" did not constitute new matter because they were inherent qualities of the 20-mil metal sheet in the Litton door construction.

The PTO, however, rejected the inherency argument, and with it, the Rule 60 continuation application. The PTO ordered Litton to cancel its March 13th amendment to the specification "as being drawn to new matter under 35 USC 132." (On the differences between a rejection of claims under § 112 and an objection to amendments to the abstract, specification, or drawings under § 132, *see, In re Rasmussen,* 650 F.2d 1212, 211 USPQ 323 (C.C.P.A.1981).) The PTO also ordered Litton to cancel the ex-

pressions "self-supporting" and "shatter-proof" from the claims.

Litton's patent attorney subsequently met with the two PTO examiners involved in the prosecution of the patent application. No record of what transpired at the interview was ever placed in the application file wrapper. On May 17, 1974, however, Litton filed an amendment canceling all but three of the claims in the case. Litton amended these three surviving claims to add recitals that (1) the metal laminate layer be "twenty thousandths of an inch thick," and (2) the front and rear layers of the laminate be bonded to the central metal layer by means of an adhesive "located around the periphery." Litton left, however, the words "shatterproof" and "self-supporting" in both the specification and the surviving claims. Litton made these changes, presumably, to overcome the Haagensen patent.

In this post-interview amendment, furthermore, Litton expressly requested that the PTO change the characterization of the continuation application to that of a continuation-in-part ("C–I–P") of the 1972 parent case. ("[P]lease insert the following heading and paragraph: * * * The present application is a continuation-in-part of U.S. Patent Application Serial Number 292,529 filed September 27, 1972, now abandoned.") Litton also filed on May 17, with its post-interview amendment, a C–I–P declaration signed by Klemp and Cassibo, which stated that "the subject of this [C–I–P] application which is not common to said earlier application [Serial No. 292,529], * * * [was not] in public use or on sale in the United States more than one year prior to the date of this [C–I–P] application, * * *." Litton, as of the date of this declaration, had sold products embodying the invention for more than one year.

The PTO allowed the patent based upon the revised amendments and new declaration. The '859 patent issued on October 22, 1974. Printed copies of the patent state that it issued on an application filed on July 26, 1973, and that that application was a "[c]ontinuation-in-part of Ser. No. 242,529,

Sept. 27, 1972, abandoned." The July 26, 1973 date was the date on which Litton filed the Rule 60 application and the preliminary amendment inserting the words "self-supporting" and "shatterproof."

## II

### The '859 Utility Patent

#### A. Validity

Whirlpool contends, of course, that the '859 patent is invalid, and makes several arguments to that end. Whirlpool argues that (1) the patented invention is "surely obvious" in view of the prior art, (2) the patent is invalid because the named patentees did not themselves invent the claimed subject matter, (3) the patent is invalid because Litton fraudulently concealed from the PTO an adverse claim and the facts which gave rise to it, and (4) the PTO erred in granting the '859 patent a filing date of July 26, 1973. As to its fourth ground for invalidity, Whirlpool claims that the correct filing date for the '859 patent is May 17, 1974, the date Litton filed the declaration part of the C–I–P application. If Whirlpool is correct about the filing date, then the '859 patent is invalid, pursuant to 35 U.S.C. § 102(b), because it is conceded that Litton had placed a product incorporating the invention on sale more than one year prior to that date.

Although both parties briefed and argued each of these four grounds for invalidity, we reach our decision solely on Whirlpool's fourth contention, though the other issues provided most of the monumental record and were hotly debated before us. We hold that the '859 patent is invalid because it issued from an application legally filed more than one year after Litton placed products embodying the claimed subject matter on sale.

#### 1. Filing Date of C–I–P Application

 The '859 patent is represented on its face to have resulted from a C–I–P of abandoned application Serial No. 292,529. A C–I–P application is "an application filed during the lifetime of an earlier application

by the same applicant, repeating some substantial portion or all of the earlier application *and adding matter not disclosed* in the said earlier case." United States Patent and Trademark Office, *Manual of Patent Examining Procedure* § 201.08 (4th ed. rev. 1982) (hereafter MPEP) (emphasis in original). A C–I–P application has the legal effect of, and is basically only a term of art for, a patent application disclosing the newly added matter. Law relating to a determination of the filing date of an original patent application is relevant when determining the filing date of a C–I–P application.

In many patent validity suits, the legal filing date for the application on which a patent issues is of critical importance. Federal regulation provides that the "filing date of the [patent] application is the date on which the *complete* application, acceptable for placing on the files for examination is received in the Patent and Trademark Office; or the date on which the *last part completing* such application is received * * *," 37 C.F.R. § 1.55(a) [emphasis supplied]. Furthermore, these regulations require that "[a]n application for a patent will not be accepted and placed upon the files for examination *until all its required parts,* complying with the rules relating thereto, are received * * *," 37 C.F.R. § 1.53(a) [emphasis supplied].

The PTO has expressly incorporated these regulations into its own internal procedures for incomplete applications: "If the application papers are too informal to be given a filing date, the case is held in the Application Division as an *incomplete* [emphasis in original] application * * *. *No filing date is granted* [emphasis supplied] until the incompleteness is corrected." MPEP § 506.

■ Both statute, 35 U.S.C. § 111, and federal regulation, 37 C.F.R. § 1.51, make clear the requirement that an application for a patent *must* include (1) a specification and claims, (2) a drawing, (3) an oath or declaration, and (4) a filing fee. The omission of any *one* of these component parts makes a patent application incomplete and

thus not entitled to a filing date. *Gearon v. United States,* 121 F.Supp. 652, 654, 129 Ct.Cl. 315, 101 USPQ 460, 461 (1954), *cert. denied,* 348 U.S. 942, 75 S.Ct. 364, 99 L.Ed. 737, 104 USPQ 409 (1955).

■ An application without a properly executed oath or declaration, in particular, was, in 1974, not complete and thus not entitled to a filing date. *Potter v. Dann,* 201 USPQ 574, 575 (D.D.C.1978) (Our Chief Judge Markey, then of the CCPA, sitting by designation as trial judge). The necessity of an oath or declaration was absolute. No rule permitted the PTO to act otherwise, since the oath or declaration was not among those "minor informalities" which the PTO could waive subject to subsequent correction, 37 C.F.R. § 1.53(a). (We note, parenthetically, that Congress has now removed the requirement that an oath or declaration is necessary to obtain a filing date, 35 U.S. C.A. § 111 (Supp.1982) (effective February 27, 1983). This congressional action can in no way affect the outcome of this case.)

The record is clear that Litton intended to file a C–I–P application in this case. Litton, urges, however, that it filed the C–I–P declaration because it reached an oral "compromise" with the patent examiners during its meeting with them following the final rejection of its Rule 60 continuation application. This compromise, according to Litton, consisted of an oral agreement that Litton would file the C–I–P declaration in exchange for the examiner allowing the patent to have a filing date of July 26, 1973, the date Litton first submitted the terms "shatterproof" and "self-supporting" in an amendment.

(We note, with interest, that Whirlpool failed to raise the argument that the '859 patent is invalid under 35 U.S.C. § 112, first paragraph, due to Litton's addition *by amendment* of new matter to the claims. Although our decision assumes that Litton converted its Rule 60 continuation application and its preliminary amendment into a valid C–I–P application on the date Litton filed its C–I–P declaration, we understand PTO practice to require that any new matter must be added to a C–I–P application

prior to filing, and not through amendment, *cf.,* MPEP § 608.04(b) (a preliminary amendment does not enjoy any status as part of an original disclosure). That is, a copy of the C–I–P application must be filed with the changes already made. It appears, therefore, that Whirlpool could have argued that even if the C–I–P declaration were allowed to relate back to the filing date of the Rule 60 continuation application under Rule 67(a), 37 C.F.R. § 1.67(a), it would have no effect unless filed with a C–I–P application *incorporating* new matter and that Litton simply added here new matter to a Rule 60 continuation application, making that application invalid under § 112. This issue not being addressed by the parties, however, we do not take it up.)

[4] Whether any oral compromise was reached is simply irrelevant. Litton, in obtaining its claims by complying with a written PTO requirement to convert the application into a C–I–P, *and without supplying any written record of the alleged compromise agreement,* is now estopped from arguing that any compromise precludes its application from having any filing date other than that of May 17, 1974. (We do not need to discuss whether the examiner had any authority to reach a compromise agreement as to the C–I–P's filing date. We are not shown that such authority exists. *See, e.g., Philip A. Hunt Co. v. Mallinckrodt Chemical Works,* 177 F.2d 583, 587, 83 USPQ 277, 281 (2d Cir.1949) (L. Hand, *Judge* ).) The last element of the C–I–P application filed here, the declaration, was filed on May 17, 1974. Since Litton cannot rely on inherency in the original photocopied disclosure, *see* Section II(a)(2), *infra,* May 17 is the date the C–I–P application was complete. *This* is the legal filing date of the C–I–P application.

 A C–I–P application is different from an original patent application, however, in that it often generates two effective filing dates applicable to different parts of the same patent. New matter in a C–I–P application has the filing date of *that* C–I–P application. The earlier filing date of the parent application pertains to

material in the C–I–P application also disclosed in the prior application. 35 U.S.C. § 120. *See, e.g., In re Scheiber,* 587 F.2d 59, 62, 199 USPQ 782, 785 (C.C.P.A.1978). If matter added through amendment to a C–I–P application is deemed inherent in whatever the original parent application discloses, however, that matter also is entitled to the filing date of the original, parent application. Before any factual determination can be made as to whether newly added matter is inherent in the parent application, however, the circumstances surrounding the prosecution of the patent in the PTO must be examined.

2. *Effective Filing Date of Newly Added Words "Shatterproof"/"Self-Supporting."*

Litton, in response to a PTO requirement, voluntarily turned its Rule 60 continuation application into a C–I–P application. We are cognizant, however, of no reason for Litton to file a C–I–P application unless it thought it was "adding matter not disclosed" in its parent application. A Rule 60 continuation application, that is, not stated to be in part, suffices "to introduce into the case a new set of claims and to establish a right to further examination by the primary examiner," MPEP § 201.07, in those situations where the new application does not include anything which would constitute new matter.

 The district court, however, concluded that Litton did not really add new matter. The court relied on Litton's contentions that the PTO had abandoned its position that the added limitations were new matter. A conclusion, however, whether of fact or law, that Litton did not really add new matter to its C–I–P disclosure cannot retroactively contradict the prosecution history of the '859 patent in which Litton, by recasting its Rule 60 continuation application as a C–I–P, implied that it did add new matter. Litton's own actions before the PTO require such a holding. We hold, therefore, that Litton is estopped from arguing that 20-mil perforated metal sheets inherently are "self-supporting" and "shat-

terproof." We do not need, thus, to address the district court's findings as to inherency.

We find support for our holding in the fact that the PTO requires that *all* business before it be conducted, or at least documented, in writing. PTO regulations provide, for example, that "[a]ll business with the Patent and Trademark Office should be transacted in writing * * *. *No attention will be paid to any alleged oral promise,* stipulation, or understanding in relation to which there is disagreement or doubt." 37 C.F.R. § 1.2 (emphasis supplied).

█ Applicants may, of course, conduct oral interviews with examiners under some circumstances. The applicant *must* provide in such case, however, a written record of the substance of any such meeting or discussion for inclusion in the application file wrapper: "In every instance where reconsideration is requested in view of an interview with an examiner, a complete written statement of the reasons presented at the interview as warranting favorable action must be filed *by the applicant.*" 37 C.F.R. § 1.133 (emphasis supplied).

█ The MPEP, commonly relied upon as a guide to patent attorneys and patent examiners on procedural matters, details procedures to be followed during and after an interview. The MPEP has no binding force on us, but is entitled to notice so far as it is an official interpretation of statutes or regulations with which it is not in conflict. At the time Litton prosecuted the '859 patent application, the MPEP, expressly incorporating 37 C.F.R. § 1.133, stated that "[t]he substance of an interview must always be made [by the applicant] of record in the application, particularly where agreement between attorney and the Examiner is reached." MPEP § 713.04 (3d ed. rev. 1970), *reprinted in* A. Deller, *Walker on Patents,* ch. XVI, app. at 383 (2d ed. 1972). (The language in the current edition of the MPEP is more direct: "A complete written statement as to the substance of any face-to-face or telephone interview with regard to an application must be made of record in the application, whether or not an agreement with the examiner was reached * * *.

It is the responsibility of the applicant * * * to make the substance of an interview of record in the application file, * * *," MPEP § 713.04 (4th ed. rev. 1982).)

█ Litton, in this case, simply filed a perfunctory paper which, Litton admitted during oral argument, said virtually nothing. As a result of Litton's own failure to document the results of its interview with the patent examiners, Litton is now estopped from showing that the prosecution record is not true and that what Litton then called a C–I–P in response to a new matter rejection does not contain new matter. Because Litton's ultimate goal in submitting the C–I–P declaration was to secure a patent, and because a patent was issued as a direct and immediate result of Litton's actions, we see no reason not to extend traditional estoppel doctrine here. *See, e.g., Coleco Industries, Inc. v. United States International Trade Commission,* 573 F.2d 1247, 1258, 65 C.C.P.A. 105, 197 USPQ 472, 480 (1978) (extending file wrapper estoppel to argument made during prosecution).

█ Litton, moreover, cannot now excuse its actions because of what it *might* have done if only it had known a problem existed. Litton cannot argue, that is, that it did not *have* to file a C–I–P declaration and, therefore, should not be bound by it. A patent attorney is often faced with choices during a patent prosecution. If an attorney or patentee makes a mistake, the PTO permits the patentee to institute reissue or reexamination proceedings in certain instances. A patent attorney should not be able, however, to choose one course of action within the PTO with the anticipation that, if later checked, he or she can always choose an alternate course of prosecution in a trial before a federal judge.

█ The written records of the application's file wrapper show that the PTO allowed Litton's patent claims after a new matter rejection, on the premise that they be supported by a C–I–P declaration. Litton complied with the C–I–P requirement, without making any objection on record. If Litton truly believed that the new limita-

**1440**

tions "self-supporting" and "shatterproof" were inherent in the patent application's disclosure, it could have carried its arguments to the board of appeals within the PTO and ultimately to this court's predecessor. The old Court of Customs and Patent Appeals would decide, before a patent issued, whether matter added to a C–I–P application was inherently disclosed in an original patent application. *See, e.g., In re Lange,* 644 F.2d 856, 864, 209 USPQ 288, 295 (C.C.P.A.1981); *In re Driscoll,* 562 F.2d 1245, 1248–50, 195 USPQ 434, 437–38 (C.C.P.A.1977). Different standards for estoppel apply, however, before and after a patent issues. *Cf. Rohm & Haas Co. v. Crystal Chemical Co.,* 722 F.2d 1556, 1571, 220 USPQ 289, 301–302 (Fed.Cir.1983) (considering the amelioration before a patent issues of misrepresentations to the PTO) and, *In re Clark,* 522 F.2d 623, 187 USPQ 209 (C.C.P.A.1975) (considering the amelioration after a patent issues of a failure to inform the PTO of highly relevant prior art).

Litton chose instead to abandon its right to review via PTO appellate procedure, and rather, acquiesced to the PTO's requirement for a C–I–P declaration, for whatever reason. Litton is now bound to its acquiescence. Judge Learned Hand persuasively stated in a similar context that "[i]f the result is harsh and over strict, it arises from the laws as to 'continuations.'" *Philip A. Hunt Co. v. Mallinckrodt,* 177 F.2d at 587, 83 USPQ at 281. We agree. We hold the '859 patent invalid.

### III

#### *The '990 Design Patent*

Whirlpool takes issue with the district court's holding that the '990 design patent is valid, arguing that the design would have been obvious. Whirlpool also disputes the trial court's finding that Whirlpool microwave ovens infringe the design patent.

This is the design claimed by the design patent in suit:

D-226,990
Wolfe, Tapper (5/23/73)
<u>Litton</u>

---

We affirm on validity, but reverse on the issue of infringement.

#### A. *Validity*

█ The tests for determining the validity of a design patent issued pursuant to 35 U.S.C. § 171 are identical to those tests currently espoused by this court for deter-

mining the validity of a utility patent issued pursuant to 35 U.S.C. § 101. *In re Nalbandian,* 661 F.2d 1214, 211 USPQ 782 (C.C.P.A.1981). Section 171 mandates this rule: "[t]he provisions of this title [title 35] relating to patents for inventions shall apply to patents for designs, except as otherwise provided."

Accordingly, 35 U.S.C. § 103 (and all the case law interpreting that statute) applies with equal force to a determination of the obviousness of either a design or a utility patent. Section 103 prohibits a patent from issuing when the "differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made * * *." As in any analysis of the obviousness issue, we must consider the scope and content of the prior art, the differences between the prior art and the claims at issue, and the level of ordinary skill in the art at the time the invention was made. *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545, 148 USPQ 459, 467 (1966). In addition, so-called secondary considerations, such as commercial success, are relevant.

The trial court, unfortunately, made no findings as to the first consideration, the scope and content of the prior art relevant to the '990 patent. Seven patents which Whirlpool presented at trial in order to show the obvious nature of the design in the '990 patent are clearly appropriate art, however. These patents include four design patents issued for General Electric and Sharp microwave ovens, one design patent for a convection oven, and two utility patents for microwave ovens. (The appearance of a utilitarian or mechanical device properly may be cited as a reference when considering the obviousness of a design. *In re Jennings,* 182 F.2d 207, 37 C.C.P.A. 1023, 86 USPQ 68 (1950).)

We show these prior art ovens here (issuing date in parentheses).

D-228,607
Binzer, Schmitt, Wooding,
Sugunoya and Miyake (10/16/73)
<u>General Electric</u>

D-228,313
Sugunoya and Miyake
(9/4/73)
<u>Sharp</u>

D-225,579
Sugunoya and Miyake
(12/19/72)
<u>Sharp</u>

D-225,780
Binzer, Schmitt & Wooding
(1/2/73)
<u>General Electric</u>

D-202,317
Waltman (9/14/65)
Magic Chef

No. 3,651,300
Haagensen (3/21/72)
Matsushita Electric

No. 3,321,604
Stecca, Barnas, Dokos, Jarzembski and Norris
(5/23/67)

The second step of the obviousness inquiry is to determine the differences between the prior art and the claimed design. The trial court found several such differences, noting that Litton's design had a "clean and simple design with a sharp and modernistic appearance," used a "light-weight, slim appearing door," used "louvers at the top of the oven," and had an "uncluttered presentation of the controls in relation to the face of the oven."

The trial court also found three other differences. It found specifically, that the Litton oven has a "three-stripe border with a central color different from the inner and outer stripes," that the Litton oven "lacks a door handle," and that the Litton oven has a door which is "opened by the use of a latch release lever located on the bottom portion of the control panel."

 The third *Graham* inquiry is to determine the level of skill in the art at the time the invention was made. In a design patent case, the fictitious section 103 person of ordinary skill is "the designer of ordinary capability who designs articles of the type presented in the application." *In re Nalbandian,* 661 F.2d at 1216, 211 USPQ at 784.

 Finally, commercial success, while relevant as showing the nonobviousness of an invention, presents a special difficulty in a design patent case. To be of value, evidence of commercial success must clearly establish that the commercial success is attributable to the design, and not to some other factor, such as a better recognized brand name or improved function. Although the Litton oven did meet with good commercial success, there is no evidence attributing this success to the Litton design. Thus, the evidence of commercial success is of no help to Litton in this case.

 On the basis of the facts found in response to the above inquiries, the trial court held that the ordinary designer would not have found Litton's microwave oven design, as a whole, obvious in light of the differences between the prior art and the claimed design. In reaching its decision, the court correctly gave the design patent,

which had survived the scrutiny of the PTO, the same statutory presumption of validity it would give a utility patent pursuant to 35 U.S.C. § 282.

 When we compare the prior art with the '990 design, however, we find that the prior art references *all* show doors as "slim appearing" as the door claimed in the '990 patent. There is, in addition, no justification whatever for the trial court's finding that the '990 patent design shows a "light-weight" door, or even, a door more "light" than any of the prior art references. Finally, the prior art clearly discloses an uncluttered control layout. As to these "differences," therefore, we hold that the district court committed clear error.

We note that we are not just separating out individual elements used here to create a new, composite design. Whirlpool, for example, erroneously uses a piecemeal approach, one in which it takes the individual elements, item by item, and tries to show us that they each exist somewhere in the prior art. "That all elements of an invention may have been old (the normal situation), some old and some new, or all new, is however, simply irrelevant." *Environmental Designs Ltd. v. Union Oil Co. of California,* 713 F.2d 693, 698, 218 USPQ 865, 870 (Fed.Cir.1983). The elements we single out are shown in *all* of the prior art patents. Thus, they are not valid indicators of the differences between the invention claimed in the '990 patent and the prior art.

 We also note that there are a large number of similarities between the Litton design and that of the prior art. The fact that similarities exist, however, does not, and cannot, control our decision. It is the difference between the subject matter sought to be patented and the prior art which matters. Since differences do exist, we hold that Whirlpool has failed to convince us that the trial court committed reversible error in holding that a person of ordinary designer skill would not have found the design, *as a whole,* obvious. The district court's holding that the '990 patent is valid is affirmed.

B. *Infringement*

More than one hundred years ago, the Supreme Court established a test for determining infringement of a design patent which, to this day, remains valid. *Gorham Co. v. White,* 81 U.S. (14 Wall.) 511, 20 L.Ed. 731 (1871). This test requires that "if, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other." *Id.* at 528, 20 L.Ed. 731.

■ For a design patent to be infringed, however, no matter how similar two items look, "the accused device must appropriate the novelty in the patented device which distinguishes it from the prior art." *Sears, Roebuck & Co. v. Talge,* 140 F.2d 395, 396 (8th Cir.1944); *Horwitt v. Longines Wittnauer Watch Co.,* 388 F.Supp. 1257, 1263, 185 USPQ 123, 128 (S.D.N.Y.1975). That is, even though the court compares two items through the eyes of the ordinary observer, it must nevertheless, to find infringement, attribute their similarity to the novelty which distinguishes the patented device from the prior art. (This "point of novelty" approach applies only to a determination of infringement. *See, e.g., Medtronic, Inc. v. Cardiac Pacemakers, Inc.,* 721 F.2d 1563, 1567, 220 USPQ 97, 101 (Fed.Cir.1983). This court has avoided the point of novelty approach in other contexts. *See, e.g., Carman Industries, Inc. v. Wahl,* 724 F.2d 932 at 940 (Fed.Cir.1983) (double patenting); *In re Gulack,* 703 F.2d 1381, 1385 n. 8, 217 USPQ 401, 403 n. 8 (Fed.Cir.1983) (unobviousness).)

The novelty of the '990 patent consists, in light of our analysis in the previous section on the '990 patent's validity, of the combination on a microwave oven's exterior of a three-stripe door frame, a door without a handle, and a latch release lever on the control panel. The district court expressly found, however, that the Whirlpool design had none of these features.

■ We recognize that minor differences between a patented design and an accused article's design cannot, and shall not, prevent a finding of infringement. In this case, however, "while there is some similarity between the patented and alleged infringing designs, which without consideration of the prior art might seem important, yet such similarity as is due to common external configuration is no greater, if as great, between the patented and challenged designs as between the former and the designs of the prior art." *Applied Arts Corp. v. Grand Rapids Metalcraft Corp.,* 67 F.2d 428, 430 (6th Cir.1933). Where, as here, a field is crowded with many references relating to the design of the same type of appliance, we must construe the range of equivalents very narrowly.

■ We hold, therefore, that the scope of protection which the '990 patent affords to a microwave oven is limited in application to a narrow range: the three-stripe effect around a door with no handle and the latch release mounted on the control panel. The Whirlpool ovens, therefore, do not infringe the '990 design patent. The contrary conclusion of the district court is clearly erroneous, being attributable to its failure to apply the correct legal standard of infringement in design patent cases.

IV

*Unfair Competition*

Litton alleges that Whirlpool's infringement of Litton's '990 design patent and Whirlpool's copying of other unpatented aspects of the Litton Microwave oven's product configuration violates section 43(a) of the Trademark Act of 1946 ("Lanham Act"), 15 U.S.C. § 1125(a), the Minnesota Uniform Deceptive Trade Practices Act, Minn.Stat.Ann. §§ 325D.43–.48, and the Minnesota common law. We consider the federal cause of action first.

A. *The Section 43(a) Action*

■ In order to prove a violation of section 43(a) of the Lanham Act, a plaintiff must establish the existence of three ele-

ments: (1) that the trade dress or product configuration of the two competing products is confusingly similar; (2) that the appropriated features of the trade dress or product configuration are primarily nonfunctional; and (3) that the trade dress or product configuration has obtained secondary meaning. *See, e.g., Truck Equipment Service Co. v. Fruehauf Corp.,* 536 F.2d 1210, 191 USPQ 79 (8th Cir.), *cert. denied,* 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976); *Ideal Toy Corp. v. Plawner Toy Manufacturing Corp.,* 685 F.2d 78, 216 USPQ 102 (3d Cir.1982). (That a product configuration is federally registrable and thus protectible under the Lanham Act, *see In re Mogen David Wine Corp.,* 328 F.2d 925, 51 C.C.P.A. 1260, 140 USPQ 575 (1964) (*Mogen David I*); *In re Mogen David Wine Corp.,* 372 F.2d 539, 54 C.C.P.A. 1086, 152 USPQ 593 (1967) (*Mogen David II*).)

Whirlpool argues on appeal that the district court failed to make any finding concerning functionality, erred in determining whether the product configuration of the Litton ovens had achieved a secondary meaning, and incorrectly treated the issue of confusing similarity.

We agree with Whirlpool that the district court committed reversible error on the issue of confusing similarity. Since we decide Litton's Lanham Act claim solely on this ground, we pass no judgment on the other issues or elements involved in the federal claim.

### 1. *Choice of Law*

As an initial matter, we confront the necessity of determining the standard of review applicable to the issue of likelihood of confusion. The Eighth Circuit, in which this case was tried, has held, that "[l]ikelihood of confusion is a finding of fact * * * [in which case the appeals court] must uphold the trial court's finding of likelihood of confusion unless it is clearly erroneous." *SquirtCo v. Seven-Up Co.,* 628 F.2d 1086, 1091, 207 USPQ 897, 900 (8th Cir.1980). Our circuit, which has jurisdiction over this appeal, has held, however, that "the issue of likelihood of confusion is the ultimate con-

clusion of law to be decided by the court, and that the clearly erroneous rule is not applicable." *Giant Food, Inc. v. Nation's Foodservice, Inc.,* 710 F.2d 1565, 1569, 218 USPQ 390, 394 (Fed.Cir.1983).

The Federal Circuit has yet to issue an opinion on which rule it will follow in a Lanham Act case where the district court was located in a circuit having a precedent differing from one we later established. The issues as to Lanham Act jurisdiction are before us only as pendant matters and are not among the matters as to which our jurisdiction is exclusive under 28 U.S.C. § 1295(a). Neither Litton nor Whirlpool, furthermore, appears to have recognized the problem here, for neither party has raised the issue to us.

We do not need to go out of our way to resolve the issue in *this* case, however. Our review of the district court's decision on likelihood of confusion has left us with a definite and firm conviction that a mistake has been committed, giving *all* due deference to the opportunity of the trial judge to evaluate the credibility of witnesses and to weigh the evidence, the standard stated in, *e.g., Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 855, 102 S.Ct. 2182, 2188, 72 L.Ed.2d 606, 214 USPQ 1, 6 (1982). Since we hold that the trial court has committed clear error, we deem its judgment reversible under either a legal or factual standard. A decision as to the exact level of error which is necessary for reversal, therefore, must await a case where resolution is necessary.

### 2. *Likelihood of Confusion*

█ As to the issue of likelihood of confusion, the district court stated that since Whirlpool's "microwave ovens are substantially identical in appearance to * * * [Litton's] 400 series microwave ovens, * * * a purchaser of ordinary prudence would be induced by the marked resemblance in general effect to mistake one for the other." Likelihood of confusion exists, the district

court reasoned, because the "two ovens look the same in the eyes of the casual buyer." [1]

The district court incorrectly treated as decisive evidence of "confusing similarity" the fact that the Litton and Whirlpool ovens had similar features. Likelihood of confusion cannot, however, be founded on mere similarity between products. The court failed to note, in particular, that the similarity of design between the Whirlpool and Litton ovens is, except as to very few items, a similarity shared by many microwave ovens then on the market, including all those ovens before us as exhibits.

The district court also failed to recognize that "[t]he most common and effective means of apprising intending purchasers of the source of goods is a prominent disclosure on the container, package, wrapper, or label of the manufacturer's or trader's name * * * [and that when] that is done, there is no basis for a charge of unfair competition." Venn v. Goedert, 319 F.2d 812, 816, 138 USPQ 415, 417–18 (8th Cir. 1963) (Minnesota law applied). The theory of the district judge, rather, is that somehow Whirlpool unfairly competes with Litton despite placing the name Whirlpool on the front of its ovens in three places, while the name Litton nowhere appears on them.

The accused Whirlpool ovens, in particular, conspicuously display the word "Whirlpool" not just once, but three times on the front, and in moderately large letters too. Likewise, the name "Litton" appears conspicuously on the front of the Litton ovens. Microwave ovens made by third parties, not involved in this litigation, display the same peculiarity. It is manifested in microwave oven exhibits in this case labeled "General Electric," "Admiral," "Roper," and "Sharp." Clearly, ordinary users of microwave ovens are accustomed to seeing the maker's or the brand name conspicuously placed for their edification, and distributors and dealers must suppose that this information is important to the consumer.

We recognize that this rule is not without exception. The legal effect of labeling a product with its manufacturer's name depends or may depend on both the prominence of the label and the type of product. There may be, and doubtless are, products whose consumer buyers would take little notice of a maker's name or disregard a name plainly evident to the buyer's eye. Venn v. Goedert, supra, for example, relates to cookies, a product no doubt many have eaten without noticing the maker's name, if indeed it appeared at all.

Microwave ovens, however, like electric ranges, Tappan Co. v. General Motors Corp., 380 F.2d 888, 154 USPQ 561 (6th Cir.1967), and high fidelity loudspeakers, Bose Corp. v. Linear Design Labs, Inc., 467 F.2d 304, 175 USPQ 385 (2d Cir.1972), are expensive items. The ordinary consumers of such goods would exercise much more discriminating care in their purchases of those items than would the purchaser of an inexpensive, routinely purchased product such as a desk-style checkbook, e.g., John H. Harland Co. v. Clarke Checks, Inc., 711 F.2d 966, 219 USPQ 515 (11th Cir.1983), or bottle of medicine capsules, SK & F Co. v. Premo Pharmaceutical Laboratories, Inc., 625 F.2d 1055, 206 USPQ 964 (3d Cir.1980).

Both of the last cited cases treat the use of the correct maker's name as evidence, but not necessarily conclusive, that there has been no illicit passing off. The weight of this evidence suffered in the Harland case because the fact was noted that the user would not see the name of the maker

1. *Note by author of opinion*

If the author of this opinion were speaking for himself alone, and not for a court of multiple members, he would dispose of the entire matter of likelihood of confusion at this point by stating that the conclusions of the district judge are absurd, a characterization he would suppose embraces both "clear error" and "legal error." It appears to him that the district judge, having "thrown the book" at Whirlpool on the patent issues, was so carried away by his indignation as to follow up the book with the paperweight and the inkwell. It is hoped the rather laborious analysis that follows in the text establishes that this use of the latter projectiles was unwarranted and in fact absurd, whether or not it would have added anything to the damages to be mulcted against Whirlpool. The brevity of the district judge's analysis of "likelihood of confusion," and its glaring omissions, would seem to imply that it was not considered important.

of the checks until receipt of an order he had already placed; in the *SK & F* case, its weight suffered because the maker's names were printed so small that elderly judges could not read them.

As in many areas of law, there can be no "bright line." Many case records may present a situation where the determination of a trial judge or a jury, either way, would not present clear or reversible error to an appellate court. A party who is actually passing off its product as that of another, or abetting others in doing so, is not necessarily or automatically immunized by affixing its own name or trademark to the product, in any manner. But why affixing a name is not sufficient to avoid a likelihood of confusion should be shown by the plaintiff, and not assumed by the trial judge. The district court made no findings, as were made in *Harland v. Clarke Checks, supra,* and *SK & F Co. v. Premo Pharmaceutical Laboratories, Inc., supra,* as to how a purchaser confronted with a correct brand or maker's name could still be confused or deceived. Nor can we find any basis from the record for determining that there is a likelihood of confusion, when the labeling of the ovens is considered. Litton's "ample evidence" of likelihood of confusion consists of the testimony of one "expert" witness who did not consider labeling when comparing the ovens, and another "expert" witness who said there might be confusion "if one does not really look closely at the difference in the name." Litton's "evidence" of actual confusion, furthermore, consisted only of a story related by its past-president of its Marketing and Sales Division as to how some "people and distributors" asked him, at the industry show in which Whirlpool first unveiled its new microwave oven, whether Litton made the ovens for Whirlpool. Finally, Litton's "unrebutted" survey evidence that half of those who have "shopped for or looked at" microwave ovens chose Whirlpool and Litton ovens in response to the survey question: "[b]y the way, do any of these microwave ovens look to you like they might have been made by the same company, or not," is simply irrelevant as to whether an ordinary shopper

might be confused into buying a Whirlpool oven when intending to buy a Litton oven. The survey question merely supports that which we already know: the Litton and Whirlpool ovens share several design features. We regard this evidence as equivocal or evasive and, therefore, not substantial enough to overcome the testimony given by the products themselves.

The decision of the trial judge here is wrong because it assigns no weight to the practice of the trade, shown by the exhibits, of placing the maker's or brand name conspicuously on the front of the microwave oven and the practice of Whirlpool, in particular, in exceeding, not falling behind others, in the display of its own name. The decision thus simply lacks the support of substantial evidence, which would normally include such factors as "(1) the strength of plaintiff's designation, (2) the degree of similarity [or dissimilarity] between the plaintiff's and defendant's marks, (3) the relative nature of products involved, (4) the marketing of the products, including the manner in which the products are provided, and their respective trade channels, (5) the degree of care likely to be employed by consumers due to the price and other characteristics of the products, (6) the frequency and casualness of the purchase, and (7) whether defendant is deliberately trafficking in the plaintiff's mark." *Scott v. Mego International, Inc.,* 519 F.Supp. 1118, 1128–29, 213 USPQ 824, 833 (D.Minn.1981) (Lanham Act and Minnesota law analyzed). *Compare In re E.I. DuPont DeNemours & Co.,* 476 F.2d 1357, 1360, 177 USPQ 563, 567 (C.C.P.A.1973) (must consider thirteen factors when testing for likelihood of confusion). We hold that there is clear error, and thus reversible error, as to the district court's determination of likelihood of confusion.

B. *State Actions*

Litton brought its unfair competition action not only under the federal Lanham Act, but also under the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat.Ann. §§ 325D.43–.48, and the Minneso-

**1448**

ta common law. The Minnesota statute provides, in pertinent part, that "[a] person engages in a deceptive trade practice when, in the course of his business, * * * he: * * (2) causes likelihood of confusion or of misunderstanding as to the source * * * of goods or services * * *." Minn.Stat.Ann. § 325D.44.

In its analysis of the state actions, the district court determined that a "claim under the Minnesota Deceptive Trade Practices Act is substantially the same as the federal claims." The district court concluded, therefore, that since Litton prevailed on its Lanham Act claim, it also must prevail on the Minnesota statutory cause of action. Finally, the district court stated, without explanation, that "proof of the violations of the Federal and Minnesota laws is sufficient to find defendant liable under theories of common law unfair competition."

The conclusion of the district court that state law is the same as federal law respecting "likelihood of confusion," is not challenged and would seem dispositive in view of our conclusions that there is no likelihood of confusion under federal law. However, the district court should have considered a preliminary jurisdictional question. The district court, in this case, erred in reaching any element of the state causes of action. The district court should have disposed of these actions, that is, in view of the preemption doctrine as applied in *Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661, 140 USPQ 524 (1964) ("[B]ecause of the federal patent laws a State may not, when the article is unpatented and uncopyrighted, prohibit the copying of the article itself or award damages for such copying." *Id.* at 232, 84 S.Ct. at 789, 140 USPQ at 528.), and *Compco Corp. v. Day-Brite Lighting, Inc.,* 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669, 140 USPQ 528 (1964).

We recognize, in dismissing these state actions, that although language in the *Sears* and *Compco* cases can be construed quite broadly, subsequent Supreme Court cases have limited the prospective effect of the so-called *Sears-Compco* doctrine. *See, e.g.,* *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315, 181 USPQ 673 (1974) ([State] trade secret law is not preempted by the federal patent law, * * *." *Id.* at 493, 94 S.Ct. at 1892, 181 USPQ at 682); *Goldstein v. California,* 412 U.S. 546, 93 S.Ct. 2303, 37 L.Ed.2d 163, 178 USPQ 128 (1973) ("No * * * conflict between state law and federal [copyright] law arises in the case of [state protection of the] recordings of musical performances." *Id.* at 570, 93 S.Ct. at 2316, 178 USPQ at 138). No Supreme Court case, however, limits the effect of the *Sears-Compco* doctrine with respect to factual situations similar to those at issue in the *Sears* and *Compco* cases.

In the present case, the microwave ovens which Litton alleges that Whirlpool copied are protected by a valid design patent. The type of design at issue here, therefore, is clearly protectible by federal statute. The key to determining whether the *Sears* and *Compco* cases prohibit a state action is whether a design is of the type on which a patent may issue. The reason that a particular design does not infringe an issued design patent is not relevant in a preemption dismissal. In *Sears,* the copied design was not an infringement of a design patent because the design patent was held invalid. Here, the allegedly copied design simply does not infringe the valid design patent. Under these two situations, the design of the alleged copy was not patented. Since state unfair competition law may not give relief "against copying of an unpatented industrial design," *Compco, supra* 376 U.S. at 234, 84 S.Ct. at 780, 140 USPQ at 529, it equally cannot extend to a noninfringing use of a patented design. We must dismiss the state action.

The *Sears* and *Compco* cases do not prohibit, of course, the right of a state to require "those who make and sell copies to take precautions to identify their products as their own." *Compco, supra* at 238, 84 S.Ct. at 782, 140 USPQ at 530. Litton argues here, however, not that Whirlpool improperly labels its ovens, but that Whirlpool copies the product configuration of the Litton microwave ovens. Litton claims,

that is, that the actual configuration of its microwave ovens has developed a "secondary meaning" which identifies Litton as the maker of its ovens. Assuming, *arguendo,* that Litton *could* prove likelihood of confusion and secondary meaning, however, "neither these facts nor any others can furnish a basis for [state law] imposing liability for or prohibiting the actual acts of copying and selling," regardless of the copier's motives. *Id.* at 238, 84 S.Ct. at 782, 140 USPQ at 531.

## V

### *Conclusion*

United States Patent No. 3,843,859 is invalid, under 35 U.S.C. § 102(b), since a product embodying the claimed invention was placed on sale in the United States more than one year before the legal filing date of the C–I–P patent application. United States Design Patent No. D–226,990 is valid, but not infringed by the Whirlpool microwave ovens involved in this action. The Minnesota causes of action are not maintainable. Finally, the prominently displayed name tag on the face of the Whirlpool ovens, and the other circumstances of this case, prevent a finding of a likelihood of confusion, and thus preclude any holding of unfair competition under the Lanham Act. Each party to bear its own costs.

AFFIRMED IN PART AND RE-VERSED IN PART.