**SUN HILL INDUSTRIES, Plaintiff,**

v.

**EASTER UNLIMITED, Defendant.**

**No.  CV–92–1783.**

United States District Court, E.D. New York.

Sept. 10, 1993.

Gerard F. Dunne, Wyatt, Gerberg, Burke & Baddie, New York City, for plaintiff.

Lawrence Rosenthal, Blum Kaplan, New York City, for defendant.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

In March of 1993, this court presided over a non-jury trial in which plaintiff Sun Hill Industries, Inc. ("Sun Hill") alleged that defendant Easter Unlimited, Inc. d/b/a Fun World ("Fun World") infringed a design patent for a pumpkin leaf bag. Based on the following findings of fact and conclusions of law made pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, this court finds infringement and accordingly awards judgment to plaintiff.

## FINDINGS OF FACT

### I. Background

Sun Hill's complaint, filed on April 13, 1992, states two grounds for relief: that de-

fendant Fun World infringed plaintiff's design patent No. Des. 310,023 (the " '023 patent") in violation of 35 U.S.C. § 101 *et seq;* and that defendant infringed plaintiff's Certificate of Copyright Registration No. VA 391–064 in violation of 17 U.S.C. § 101 *et seq.* In a Memorandum and Order dated October 8, 1992, familiarity with which is presumed, this court held that Fun World had not infringed Sun Hill's copyright because defendant's product did not usurp that which was protected by the copyright—the facial graphics.[1] In that same Memorandum and Order, however, this court denied Sun Hill's motion for summary judgment as to defendant's liability for design patent infringement, finding triable issues concerning the '023 patent's validity and point of novelty. Finally, the October Order severed the issue of liability from any question of damages so that the parties could proceed expeditiously to trial.

That trial took place on March 15, 16 and 17, 1993.[2] In addition to hearing testimony concerning Fun World's liability for patent infringement, this court also was presented with evidence on Fun World's counterclaims for: (1) slander; (2) trade defamation and disparagement; (3) tortious interference with business relations, economic advantage, and prospective economic advantage; (4) unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); and (5) patent invalidity.[3]

## II. *Creating and Patenting the GIANT STUFF–A–PUMPKIN*

The parties to this action are companies involved in the manufacture of toys and specialty items specifically designed for various holidays. The products in dispute are over-size orange plastic bags which are tucked at the bottom and imprinted with black graphics; when stuffed with dry leaves or crumpled newspapers, the products simulate giant jack-o-lanterns suitable for decorating a lawn during the Halloween season. Exemplars of the two bags, stuffed with shredded computer paper, were introduced at trial as PX 26A (the GIANT STUFF–A–PUMPKIN) and PX 6A (the Fun World pumpkin bag). (*Tr.* at 91).

Sun Hill's version of this leaf bag, marketed under the trademark GIANT STUFF–A–PUMPKIN, was designed in 1988 and introduced into the market in 1989. (*Tr.* at 49–50, 58, 152). Benson Zinbarg, the president of Sun Hill (*Tr.* at 48), described the invention of this product as follows:

A: [Sun Hill has] creative sessions on pay day, which means Thursday at 8:00 in the morning. I don't remember exactly which Thursday. We have a matter of record, we could check it out but it was a Thursday in November, after Halloween and before Thanksgiving.

I came to that meeting with a proposition that we will go into a Halloween line of goods and that we will not cause product liability problems. That negated costumes, makeup, masks, and narrowed it down to home decor.

We quickly zeroed in on home decor, what items would be most important, and pumpkins came to the top.

The group of key employees at this meeting tossed around ideas of how to decorate pumpkins, carve pumpkins, pre-

---

1. This court reasoned as follows:

    Sun Hill claims that the GIANT STUFF–A–PUMPKIN is a unique combination of color, shape and decoration resulting in a pumpkin sculpture. However, since the jack-o-lantern is a familiar and generic figure, Sun Hill cannot monopolize *any* expression of a jack-o-lantern; rather, the protection afforded to Sun Hill through its Certificate of Copyright registration can extend only to its particular and unique version of how a carved pumpkin appears. *See Eden Toys Inc. v. Marshall Field & Co.,* 675 F.2d 498, 500 (2d Cir.1982).... [This] court ... must separate the generic figure of a jack-o-lantern from Sun Hill's version. In so doing, the rounded shape and orange color of the figure belong to all pumpkins; however, the actual facial depictions are unique and can be protected.

    (Memorandum and Order at 7).

2. Citations to the trial transcript are hereinafter referred to as "*Tr.* at ____." Exhibits introduced by plaintiff and defendant at trial are respectively referred to as "PX __" and "DX __."

3. Fun World abandoned its counterclaim for sanctions under Rule 11. In addition, both parties essentially agreed that in light of this court's prior Order, the issue of copyright infringement and invalidity would not be pursued.

serve pumpkins, do all kinds of things with pumpkins.

Shortly thereafter, our purchasing agent said, why not make a pumpkin out of a leaf bag. There are leaves around at that time. Why don't we have people stuff a bag and it would look like a pumpkin if we make it in the right shape and design.... The meeting ended with no conclusion, but a day or two later, I dwelled on it and thought about it and said if we make this the biggest one people have ever seen, this would have tremendous commercial value. If we made one that was inexpensive and fun it would have tremendous commercial value.

Q: When you say "biggest one ever seen," what—

A: Make it oversized. Make it not like a normal sized pumpkin which is probably about twelve inches in diameter or smaller but make it much bigger than twelve inches in diameter because those pumpkins get to be expensive and rare, and we eventually blew it up to the equivalent of a five hundred pound pumpkin, which is unique....

At that point Anita and I called in our art director, Nancy Mimoun and one of our artists, Kate Randall whose name is now Randall–Reed, and asked them to make some designs that would be simple as somebody would normally carve a pumpkin. We did not want a fancy face. When people carve a pumpkin it is carved with a straight kitchen knife....

We then purchased some orange plastic material and somehow seamed it together to make it into a—a bag and we made color forms. We took some of the sizes—the shapes that Kate had drawn and we cut them out of—she cut them out of black paper and we started scotch taping them on to the bag and then the question came up, do we want a happy face or do we want a scary face because at Halloween, often people like ghoulish things like skeletons and skulls and bats and other people like happy smiley cheerful things.

We couldn't make up our minds which way to go and I made a decision. Why don't we on one product make a happy face and a scary face, and satisfactory [sic] both customers and make it more saleable.

(*Tr.* at 54–56; *see also Tr.* at 97, 225). The result of this creative process was PX 26A, the GIANT STUFF–A–PUMPKIN, which possesses the following characteristics: is 60 inches tall and 58 inches wide; has a rounded bottom with a star-seal closure; has a black imprint of a scary face on one side, a happy face on the other side, and vertical black lines simulating pumpkin creases; is sold with a twist tie which, after the bag is stuffed with leaves, debris, or crumpled newspapers, completes its rounded top. (*Tr.* at 51).

The first decorative lawn assembly for Halloween of its type, the GIANT STUFF–A–PUMPKIN enjoyed significant media attention and financial success. (*Tr.* at 59–60). Zinbarg testified that sales of this product dwarfed sales for the company's other Sun Hill products. (*Tr.* at 61). Sol Feit, the Sun Hill sales manager, testified that whereas in 1989 Sun Hill had no competitors for its pumpkin bag product, by 1991 the situation had shifted completely. (*Tr.* at 17–18). Sun Hill understandably wanted to protect its creative idea and accordingly applied for a utility and a design patent for the pumpkin bag in 1989 and 1990 respectively.[4]

In connection with its design patent application, Sun Hill filed a "petition to make special" which alleged infringement by a competitor not involved in this action; the petition was granted in April of 1990, thereby expediting the design patent proceedings. (*Tr.* at 177; *see also* DX B). In August of 1990, Sun Hill obtained the '023 patent which covers "The ornamental design for a bag, as shown and described." (Stip. Facts ¶ 11; DX A; *Tr.* at 170, 229; *see* attached drawing).[5] The drawings that make up the '023

---

**4.** As mentioned above, Sun Hill also applied for and obtained a Certificate of Copyright Registration No. VA 391–064. (Stip. Facts ¶ 10; PX 2; *Tr.* at 52).

**5.** Plaintiff also obtained a second design patent (Des. No. 317,254) for depictions that appeared in and were later separated from the original application. (*Tr.* at 189–90). Although the parties acknowledge that the '254 patent is not at all involved in this action (*Tr.* at 226), they neverthe-

patent show six views of the same ornamental object which has facial features on both sides, a star seal closure, and a shiny surface as demonstrated by the shading; nothing in the patent mentions color or size or material. (*Tr.* at 100–01, 105, 116–17). Defendant's expert on procedures of the United States Patent and Trademark Office ("PTO"), former patent Examiner George Gerstman (*Tr.* at 166–67), testified that unlike utility or mechanical patents, the phrase "the ornamental design for ..." in connection with drawings comprise the sole claim in a typical design patent. (*Tr.* at 174).[6]

The PTO originally denied Sun Hill's application for a utility patent directed to the Halloween leaf bag. On appeal, the PTO's Board of Patent Appeals (the "Board") reversed this rejection but entered new grounds for rejection. Sun Hill amended its utility patent claims, but the PTO once again rejected its application and the Board again rejected an appeal based, *inter alia*, on obviousness double patenting and on obviousness in light of the prior art. (*Tr.* at 108–09; Stip. Facts ¶ 17).

### III. *The Fun World Bag*

In the late fall of 1989, soon after Sun Hill introduced its GIANT STUFF–A–PUMPKIN, Fun World began to market its own pumpkin lawn bag. In contrast to the STUFF–A–PUMPKIN, the Fun World bag, PX 6A, is imprinted with a jack-o-lantern face on only one side, has a different bottom closure, and lacks black vertical stripes. (*Tr.* at 103, 106–07; Stip. Facts ¶ 13). All other aspects of the leaf bags are similar. Fun World developed its bag after seeing Sun Hill's product on the market; as to the Fun World "creative" process, this court finds the following testimony from Stanley Geller, president of Fun World, especially revealing:

Q: At the time Fun World designed the product of 6A, were you aware of any other comparable products in the marketplace?

A: Yes.

Q: And you know who was manufacturing?

A: Sun Hill.

Q: How did you come to know about the Sun Hill product?

A: One of our employees, Gary Abrams, in either September or October, I forget which, was shopping in the store, saw the product and thought it might be of interest to us.

\*     \*     \*     \*     \*     \*

A: [W]e wanted to get into the product. We thought it was a viable product and my instructions were to stay as far away as possible from the design of the faces or the designs of the bag.

Q: By "designs of the bag," what do you mean?

A: I mean the two faces. Right now we are seeing one face and on the other side is a more characterized scary face, the lines; and also we decided not to have lines. We decided to have only one face. We decided on our face that we would choose, and the instructions were go back to our catalog and our prior art.

And I say we have been in the Halloween business since 1967 or 1968, and had many, many depictions of pumpkins and to pick simple ones from our prior art.

Q: Again, we are talking about the faces for the pumpkins?

A: Yes; the eyes, the nose and the mouth. And we also decided not to use the vertical lines, even though we had used vertical lines on prior products.

---

less engaged in substantial debate at trial over whether that patent was divisional or contained new matter. (*Tr.* at 179–85, 197–202, 218–20). The reason for this colloquy appears to center around the validity of the '254 patent and the effect of that patent on the '023 patent's scope or, more specifically, whether the latter covers bags with a single face. However, for the unrelated reasons described below, this court finds that defendant's one-faced bag does infringe the '023 patent.

**6.**     They called it a pumpkin bag but the examiner apparently thought it best be noted just as a bag.

And then there is one—on page three of the specification at the end, *there is the claim and every design patent just has one claim. This is typical, you say the ornamental design for a, and you name the article that it is, as shown and described.*

(*Tr.* at 174) (emphasis added).

Q: Did you change the actual geometric shape of the bags?

A: Well, we looked at their closing—Sun Hill closing.

Q: By the "closing" you mean the bottom?

A: The bottom closing. And said that possibly was where their patents were directed to.

  \*  \*  \*  \*  \*  \*

Q: Was it your intention in the fall of '89, to introduce a product that would be a larger plastic yard bag that could be bought by the customer, put on their lawns, stuffed with leaves and tied at the top so you have a simulation of a pumpkin on your lawn?

A: Pretty much, except I don't recall anything about it as being a carved pumpkin, but the first part of your question, I would respond affirmatively.

(*Tr.* at 249–53). As this testimony demonstrates, Fun World's idea for its pumpkin lawn bag came directly from Sun Hill; the actual manifestation of that bag followed consultations with Fun World's counsel concerning distinctions which would immunize defendant's bag from possible infringement suits. (*Tr.* at 249–50).[7] In an attempt to obtain a larger share of the market, Fun World sold its pumpkin leaf bags in packages containing different sizes, different numbers of bags, and different graphics. (DX AD, AF, AG, AH, AI, AL, AM; *Tr.* at 355, 361).

The pumpkin lawn bag was not Fun World's first foray into the Halloween market. To the contrary, Fun World over the years had developed many other jack-o-lantern products, including trick-or-treat bags, some of which shared the facial graphics that Fun World used on the product herein accused of infringement. (DX LA; *Tr.* at 317). Fun World also sold other Halloween lawn products, such as inflatable pumpkins and "luminaries,"[8] but did not market or know of any other company marketing pumpkin leaf

bags prior to Sun Hill's invention. (*Tr.* at 254–55).

■ Both parties offered testimony going to the morals of the toy industry and the frequency of copying—or creating "knock-offs"—in that industry. (*E.g. Tr.* at 92–95; 261). As this court indicated at trial, it finds the general existence and acceptance of copying irrelevant to the issue before it, namely infringement and validity of the '023 patent.

### IV. *Prior Art*

#### A. *The Holiday Reference*

The first example of "prior art" that was produced at trial was a 1978 book entitled *Holiday—A Handbook for Teachers of Elementary Art* (the "Holiday reference"). (PX 13; DX G). This book provides instructions for making a jack-o-lantern from a sheet of orange crepe paper which is folded in half, stapled at the edge, tied at the bottom, turned inside out, stuffed with a ball of wadded newspapers, and tied at the top. Facial features cut from construction paper or applied with paint to the exterior of the crepe paper figure simulate a carved pumpkin. (Stip. Facts ¶ 21).

PX 15 is an actual crepe paper model of the Holiday reference teaching (*Tr.* at 85–88), which was constructed by Kate Reed, the Sun Hill graphic artist who helped create the STUFF–A–PUMPKIN. (*Tr.* at 227). Reed testified that she made the exemplar by following the instructions contained in the Holiday book. Although the book indicates nothing about size (*Tr.* at 120), the artist explained that crepe paper typically comes in standard-size sheets; she also provided a credible description of her decision to make PX 15 approximately four inches in diameter. (*Tr.* at 242–44).

The Holiday reference was not considered by the Examiner in the design patent application and was first brought to plaintiff's attention on its appeal of the utility patent denial. (Stip. Facts ¶ 21; *Tr.* at 64–65). The Examiner did consider what was referred to

---

**7.** At that time, the copyright had been registered but both patents were still pending.

**8.** Luminaries are decorated paper bags into which candles are placed; the candles illuminate designs which are imprinted on or cut out of the bags. (DX N; *Tr.* at 99).

at trial as the Dennison reference, also a craft-item pumpkin made out of crepe paper and adorned with a jack-o-lantern face, (*Tr.* at 208–10); the Dennison reference was not a container for newspaper, however. (*Tr.* at 223–25).

### B. *The Everything Reference*

The second item of prior art, produced by Fun World at trial but never considered by the design patent Examiner, was *The Everything Book for Teachers of Young Children* (the "Everything reference"). (PX 14; DX H). As with the Holiday reference, the Everything reference instructs how to make a grocery bag into a pumpkin by applying orange, black, and green paint, stuffing the bag with newspapers, and banding its top. (*Tr.* at 64–65, 88–89). PX 17 is an actual manifestation of the project also made by Reed. (*Tr.* at 228). The paper grocery bag resulted in a pumpkin of rectangular shape despite attempts to mold the bag into a globe. (*Tr.* at 245–46). Zinbarg testified credibly that although the Everything reference teaches use of a "grocery" bag, children making this pumpkin would have to use a paper and not a plastic bag since paint does not adhere to the latter. (*Tr.* at 126).

### C. *The Noteworthy Reference*

The third example of prior art is a yellow, plastic trick-or-treat bag introduced in 1986 by Noteworthy Industries Inc. (the "Noteworthy Reference"). (DX I at 5, 9, 13, 15). The bag has a rounded bottom, pictures of pumpkins and advertisements printed on both sides, and an instruction to "Stuff with paper for Deco–Pumpkin" in its upper right-hand corner. (*Tr.* at 68–69). When stuffed, however, the Noteworthy bag does not itself become a jack-o-lantern but rather becomes a globe with jack-o-lanterns displayed on it. Once again, the Examiner did not consider this reference when issuing the '023 patent, but he did consider a Halloween coffee mug with faces on either side.

DX CG compiles the pumpkin pictures from the '023 patent, the Holiday reference, the Everything reference, and the Noteworthy reference and puts these jack-o-lanterns on a single sheet of paper for comparison purposes. (*Tr.* at 139–43).

### D. *Other Prior Art*

There is no dispute that large orange plastic bags were publicly known, sold, and on sale in the United States before the earliest date of invention claimed for the '023 patent. (Stip. Facts ¶ 18). Similarly, large plastic bags with bottom tucks were publicly known, sold and on sale in the United States before the earliest date of invention. (Stip. Facts ¶ 19). Finally, over the years large plastic bags capable of receiving and containing leaves or crumpled newspaper have been sold by countless companies. (Stip. Facts ¶ 20). However, as Stanley Geller testified:

Q: When the consumer is looking for this type of product does he want a yard bag, large plastic bag, that when he fills it with leaves or paper, looks like a giant pumpkin sitting on his lawn. We agree with that.

Now can you substitute for that consumer a product that would be your standard yard bag that I believe they are brown, maybe green, and just have a picture of a pumpkin that would be printed?

A: I would think that it would not be as attractive.

Q: That would not be the same product; is that correct.

A: It might serve the same function, but I don't think it would be that attractive. Sun Hill didn't think so and we didn't think so, obviously.

(*Tr.* at 258–59).

As alluded to above, the prior art revealed by the Examiner during prosecution of the '023 patent was comprised of various decorative pumpkins, for example, trick-or-treat bags with jack-o-lanterns depicted thereon, molded pumpkins for trick-or-treating, and Halloween items, such as a coffee mug, with happy faces on one side and scary faces on the other. (DX A, B, C; *Tr.* at 171, 211–14).

### V. *Counterclaims*

Testimony was elicited by both parties concerning defendant's counterclaims. The most pervasive topic of that evidence con-

cerned Fun World's allegations that Sun Hill made improper representations concerning the status and scope of its proprietary rights. Fun World asserts that Sun Hill used law suits and pending patent applications to persuade customers that not only would Fun World fail to fill their orders for bags (*Tr.* at 340–41), but also that Sun Hill would sue any customers who purchased bags from its competitors. (*E.g. Tr.* at 33–36, 39–41, 263–71, 365–66, 368–69, 399). Sun Hill claims that it provided timely and accurate information—information that it was entitled to provide—in order to update customers concerning the status of its present and future proprietary rights and its litigation stance. (*Tr.* at 378, 391–92). The remainder of the counterclaim testimony focused on allegations of false packaging (*Tr.* at 393–94) [9] and overaggressive use of the '023 patent. (*Tr.* at 129–31, 144).[10]

### CONCLUSIONS OF LAW

Sun Hill asserts that the '023 patent protects an integrated, decorative whole which represents far more than the summation of its parts: a giant plastic lawn bag with at least one jack-o-lantern face imprinted thereon and which, when filled with leaves, becomes a jack-o-lantern. When construed in this manner, plaintiff argues, the novelty of the GIANT STUFF–A–PUMPKIN is appropriated by defendant's pumpkin-motif lawn bag. Defendant interposes the following two-part response: first, that in order to uphold the validity of the design patent in issue this court must interpret the '023 patent narrowly, since a broad interpretation would render the patent obvious in light of the prior art discussed above; and second, that interpreting the claim narrowly in light of the prior art compels the conclusion that the Fun World product does not infringe its competitor's bag. For the following reasons, this court finds the design patent at issue to be valid and infringed.

---

9. Sun Hill misrepresented the place of manufacture in filling certain orders for the GIANT STUFF–A–PUMPKIN.

## I. *Patent Validity*

Section 171 of Title 35 of the United States Code, the statutory section specifically directed toward design patents, provides that:

> Whoever invents any new, original and ornamental design for an article of manufacture may obtain a patent therefor, subject to the conditions and requirements of this title.

35 U.S.C. § 171. Like utility patents, design patents are presumptively valid. 35 U.S.C. § 282; *Litton Systems, Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1443 (Fed.Cir.1984) ("In reaching its decision, the [trial] court correctly gave the design patent, which had survived the scrutiny of the PTO, the same statutory presumption of validity it would give a utility patent pursuant to 35 U.S.C. § 282."). Consequently, in order to contest the validity of the '023 patent, Fun World "must establish facts, by clear and convincing evidence, which persuasively lead to the conclusion of invalidity." *Avia Group Int'l, Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1562 (Fed.Cir.1988). Furthermore, as both parties acknowledge, patent claims are to be construed in order to uphold their validity. *See Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 799 n. 6 (Fed.Cir.1990) (citing *Carman Industries v. Wahl*, 724 F.2d 932, 937 n. 5 (Fed.Cir.1983)).

Fun World's first argument is that the '023 design patent as interpreted by plaintiff is obvious in light of the prior art. Section 103 of Title 35, applicable to design patents, prohibits a patent from issuing when "differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made." 35 U.S.C. § 103 (1982). The four factors relevant to determining obviousness are:

> the scope and content of the prior art, the differences between the prior art and the claims at issue, the level of ordinary skill in

---

10. Sun Hill placed the '023 patent on a bag sold to Texaco which did not resemble the GIANT STUFF–A–PUMPKIN in that the bag, DX AR), was rectangular, had no gusset, and depicted a jack-o-lantern on both sides.

the art when the invention was made, and secondary indicia, such as commercial success and copying. *Avia*, 853 F.2d at 1563–64 (*citing Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966)); *see also Litton Systems*, 728 F.2d at 1441. For design patents, "obviousness is determined from the vantage of 'the designer of ordinary capability who designs articles of the type presented in the application.'" *Avia*, 853 F.2d at 1564 (*quoting In re Nalbandian*, 661 F.2d 1214, 1216 (CCPA 1981)). In addition, a court addressing obviousness must not take a "piecemeal approach, one in which it takes the individual elements, item by item, and tries to show us that they each exist somewhere in the prior art. 'That all elements of an invention may have been old (the normal situation), some old and some new, or all new, is ... simply irrelevant.'" *Litton Systems*, 728 F.2d at 1443 (*quoting Environmental Designs Ltd. v. Union Oil Co. of California*, 713 F.2d 693, 698 (Fed.Cir.1983)); *see also Avia*, 853 F.2d at 1564 ("That some components of [the challenged] designs exist in prior art references is not determinative. '[I]f the combined teachings suggest only components of the claimed design but not its overall appearance, a rejection under section 103 is inappropriate.'") (*quoting In re Cho*, 813 F.2d 378, 382 (Fed.Cir.1987)).

■ Applying the above criteria to the patent at issue, this court finds that Fun World has failed to establish that the prior art would lead an ordinary designer in the field to conceive of the GIANT STUFF–A–PUMPKIN as claimed by plaintiff. The Everything, Holiday, and Noteworthy references together teach that filling orange containers with stuffing, applying graphics to their surfaces, and sealing those containers will simulate a decorative jack-o-lantern figure. However, as both parties acknowledge, there are numerous products on the market—entered into evidence at trial and even considered by the patent Examiner—which resemble or depict jack-o-lanterns and also serve as containers. (*Tr.* at 72–75, 254–55). For example, children for years have used plastic pumpkins for trick-or-treat purposes; similarly, models of pumpkins in various forms have decorated houses during the Halloween season. None of these products—alone or together—embodies or suggests the "visual whole" that is the GIANT STUFF–A–PUMPKIN. *See L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1124 (Fed. Cir.1993) ("[N]ot only the individual elements, but the ornamental quality of the combination must be suggested in the prior art.") *reh., en banc, denied, petition for cert. filed* July 12, 1993; *see also In re Rosen*, 673 F.2d 388, 390–91 (CCPA 1982). Rather, the subject matter of the '023 patent differs from this prior art in that it has a unique ornamental capacity: not only is the GIANT STUFF–A–PUMPKIN large, inexpensive, durable, and useful, but also it decorates a lawn, advertises itself, and makes trash attractive.

In this regard, it is important to make mention of the rejected utility patent and the role of the pumpkin bag's functional features to a discussion of obviousness and patent scope. Unlike a utility patent, which protects functional or mechanical aspects of an article of manufacture, 35 U.S.C. § 101 (1982), a design patent protects that which makes an article of manufacture beautiful, attractive, ornamental. Therefore, if a party obtains a design and not a utility patent for a product, its protection is confined to that product's ornamental aspects. *Lee v. Dayton–Hudson Corp.*, 838 F.2d 1186, 1188 (Fed. Cir.1988). However, this concept is not as limited as it first appears:

[I]f a patented design is "primarily functional," rather than primarily ornamental, the patent is invalid. *See Power Controls Corp. v. Hybrinetics, Inc.*, 806 F.2d 234, 238, 231 USPQ 774, 777 (Fed.Cir.1986). When function dictates a design, protection would not promote the decorative arts, a purpose of the design patent statute. *See* 1 D. Chisum, *Patents* § 1.04[2] at 1–194.1 to 1.195 (1986). There is no dispute that shoes are functional and that certain features of the shoe designs in issue perform functions. However, a distinction exists between the functionality of an article or features thereof and the functionality of the particular design of such article or features thereof that perform a function. Were that not true, it would not be possi-

ble to obtain a design patent on a utilitarian article of manufacture, *see, e.g., Pacific Furniture Mfg. Co. v. Preview Furniture Corp.*, 800 F.2d 1111, 231 USPQ 67 (Fed. Cir.1986) (design patent for chairs), or to obtain both design and utility patents on the same article, *see, e.g., Carman Indus., Inc. v. Wahl*, 724 F.2d 932, 938–39, 220 USPQ 481, 486–87 (Fed.Cir.1983); *In re Dubois & Will*, 46 C.C.P.A. 744, 262 F.2d 88, 90, 120 USPQ 198, 200 (1958).

*Avia*, 853 F.2d at 1563; *see also Power Controls Corp. v. Hybrinetics, Inc.*, 806 F.2d 234, 238 (Fed.Cir.1986) (while object's design may reveal functional features, mechanics must not dictate design or configuration). And even more recently, again in a case discussing design for athletic shoes, the Federal Circuit explained,

> A design patent is directed to the appearance of an article of manufacture. An article of manufacture necessarily serves a utilitarian purpose, and the design of a useful article is deemed to be functional when the appearance of the claimed design is "dictated by" the use or purpose of the article. *In re Carletti*, 328 F.2d 1020, 1022, 140 USPQ 653, 654 (CCPA 1964); *Power Controls Corp. v. Hybrinetics, Inc.*, 806 F.2d 234, 238, 231 USPQ 774, 777 (Fed.Cir.1986) (patented design must be primarily ornamental). If the particular design is essential to the use of the article, it can not be the subject of a design patent.

*L.A. Gear*, 988 F.2d at 1123.

In its earlier Memorandum and Order, this court made the following observations concerning the differences between the GIANT STUFF–A–PUMPKIN as claimed in the '023 patent and the relevant prior art:

> While the trick-or-treat bag [Noteworthy reference] is rounded, it differs from the products in question in that it contains a jack-o-lantern, but itself does not represent a pumpkin; however, on its top right-hand corner it has the following suggestion: "Stuff with paper for Deco–Pumpkin." In addition, the two other references are rounded, orange containers with faces that, when stuffed, become pumpkins. Where all three items diverge from the Stuff–A–Pumpkin is in the latter's function

as a leaf or lawn bag. However, design patents are limited to ornamentation and "do not and cannot include claims to the structural or functional aspects of the article." *Lee*, 838 F.2d at 1188. In sum, this prior art at least raises a genuine question as to whether the GIANT STUFF–A–PUMPKIN would have been obvious to the typical inventor in this field.

(Memorandum and Order at 12). But trial testimony, in addition to reinforcing the differences in visual appearance between the prior art references and the '023 patent, revealed that the latter is unique because it transforms an ordinary trash or leaf bag into a lawn ornament by furnishing that old article of manufacture with a new ornamental and decorative aspect. As even defendant acknowledges, there is a material difference between ordinary green or black trash or leaf bags and the ornamental pumpkin bag in dispute. (*Tr.* at 258–59). The function of plaintiff's lawn or leaf bag did not dictate its design but rather the design melded with, complemented, and made more attractive the function. As Zinbarg stated and this court finds convincing:

> Our product was meant to be a lawn or leaf bag that was converted into looking like a pumpkin to be decorative. what we created was a decorative way to put your trash outside. Most people when they put their trash outside hope that the garbage men will collect it and take it away sooner rather than later and usually you keep it by the side of the house or hidden but not normally out and displayed.

> Our invention said make this garbage bag as pretty as possible. Make it look like a pumpkin.

> .\* \* \* \* \* \*

> Out of her mind came the idea, let's take a leaf bag and make it look like a pumpkin.

> Her concept was simply that. Let's make a pumpkin from a leaf bag or a trash bag, because at that time, and she said those words specifically, *at that time of the year, two things happen. Halloween occurs and the leaves come tumbling down in most of America. Let's combine the use—combine both of these.*

Her concept was, take the leaves and put them in a bag and make the bag look like a pumpkin.

(*Tr.* at 74). This transformation is precisely what *design* patents are directed toward—ornamentation for useful articles which promotes the visual arts; it is therefore not surprising that Sun Hill's utility patent application was denied.

Secondary indicia, such as copying and commercial success, support the conclusion that the '023 patent was not obvious. *See L.A. Gear*, 988 F.2d at 1124 ("The undisputed commercial success of the patented design, and Appellant's copying thereof, are also relevant to analysis of the obviousness of a design."); *Avia*, 853 F.2d at 1564 ("Copying is additional evidence of nonobviousness."). Prior to Sun Hill's invention no other company sold a similar item; following the release of the Sun Hill pumpkin-motif bag, however, numerous companies have begun marketing similar lawn bags leading to the multitude of pending lawsuits brought by Sun Hill to protect its product. *E.g. Sun Hill Industries, Inc. v. Four Seasons Products, Inc.*, 92–CV–1177 (MBM), 1993 WL 77384 (S.D.N.Y. March 15, 1993). More pertinently, defendant admitted that its idea for a pumpkin-motif lawn bag came directly from seeing plaintiff's product on the market. *See Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1000 (Fed.Cir.) (evidence of copying is strongly indicative of nonobviousness), *cert. denied*, 477 U.S. 905, 106 S.Ct. 3275, 91 L.Ed.2d 565 (1986).

In sum, after evaluating the criteria for determining obviousness, this court finds that the '023 patent in its entirety was not rendered obvious by the relevant prior art. An ordinary designer aware of the craft books, trick-or-treat bag, trash bags, luminaries, and other Halloween items would not have conceived of Sun Hill's design as a "visual whole": an ornamental lawn bag which, when stuffed with leaves, becomes a lawn sculpture which simulates a giant jack-o-lantern.

## II. *Infringement*

■ Given the finding that the '023 patent is valid, the question that remains is whether Fun World infringed that patent. Ordinarily, deciding whether a patent has been infringed is a two-part process: a court first must interpret the claim and then must determine whether that claim encompasses or "reads onto" the accused product. *Texas Instruments, Inc. v. U.S. International Trade Comm'n*, 988 F.2d 1165, 1171 (Fed. Cir.1993). This case involves a design patent, and the specific test for infringement of such a patent, first announced by the Supreme Court in *Gorham Co. v. White*, 81 U.S. (14 Wall.) 511, 20 L.Ed. 731 (1872), requires a court to assess the "designs" as follows:

If, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other.

*Id.* (14 Wall.) at 528, 20 L.Ed. 731. In applying this test a court must assess the difference in the *overall* effect of the designs and not the difference in details:

Mere difference of lines in a drawing or sketch, a greater or smaller number of lines, or slight variations in configuration ... will not destroy the substantial identity. An engraving which has many lines may present to the eye the same picture, and to the mind the same idea or conception as another with much fewer lines. The design, however, would be the same.

*Id.* (14 Wall.) at 526–27, 20 L.Ed. 731; *see also Lee*, 838 F.2d at 1189.

■ In an effort to apply *Gorham* in a meaningful manner in accordance with other constraints of patent law—for example, claim interpretation—courts have refined the ordinary observer test by explaining that infringement requires appropriation not merely of the overall appearance of the design but rather of that aspect of the design which makes it "novel." *Avia*, 853 F.2d at 1565; *see also Litton Systems*, 728 F.2d at 1444 ("[E]ven though the court compares two items through he eyes of the ordinary observer, it must nevertheless, to find infringement, attribute their similarity to the novelty which distinguishes the patented device from

the prior art."). This "point of novelty" test requires a court to consider whether "the accused device ... appropriate[s] the novelty in the patented device which distinguishes it from the prior art." *Oakley, Inc. v. International Tropic–Cal, Inc.*, 923 F.2d 167, 169 (Fed.Cir.1991); *Avia,* 853 F.2d at 1565. Therefore, the discussion above relating to obviousness in light of the prior art is relevant to infringement analysis. *See Litton,* 728 F.2d at 1444.

In addition, it is important to observe that the "point of novelty" test is not distinct from the *Gorham* test. *See Shelcore, Inc. v. Durham Indus., Inc.,* 745 F.2d 621, 628 n. 16 (Fed.Cir.1984) (explaining that requirements of *Gorham* and "point of novelty" tests are conjunctive). Rather, in assessing a patented product's "point of novelty," a court must not lose sight of the product's overall appearance, the essence of the product's design, which always is "controlling in determining questions of ... infringement." *In re Rubinfield,* 270 F.2d 391 (C.C.P.A.1959), *cert. denied,* 362 U.S. 903, 80 S.Ct. 611, 4 L.Ed.2d 554 (1960) (*quoted in Lee,* 838 F.2d at 1189). Therefore, if a product has some function which, combined with its design, justifies its protection, that may be its point of novelty, for protection of that combination "promote[s] the decorative arts, a purpose of the design patent statute." *Avia,* 853 F.2d at 1563 (*citing* 1 D. Chisum, *Patents* § 1.04[2] at 1–194.1 to 1.195 (1986)).

In determining infringement a court must compare the accused design—in this case 6A, the Fun World pumpkin bag—with the claim in the patent and not with the actual design, as embodied in PX 26A. *Lund*

*Industries, Inc. v. GO Industries, Inc.,* 938 F.2d 1273, 1275 (Fed.Cir.1991) (vacating finding of design patent infringement because court failed to make detailed inquiry comparing patent claim to allegedly infringing visor). However, as the Court of Appeals for the Federal Circuit has explained:

When no significant distinction in design has been shown between the patent drawing and its physical embodiment, it is not error for the court to view them both, and to compare the embodiment of the patented design with the accused devices.

*Lee,* 838 F.2d at 1189.[11] As mentioned above, "[a] design patent is ordinarily claimed 'as shown', that is by its drawing." *L.A. Gear,* 988 F.2d at 1122. Explaining that design patent claims differ from the detailed and lengthy claims found in the typical utility patent, the *L.A. Gear* court cited 37 C.F.R. § 1.153(a), which instructs:

The title of the design must designate the particular article. No description, other than a reference to the drawing is ordinarily required. The claim shall be in formal terms to the ornamental design for the article (specifying name) as shown, or as shown and described. More than one claim is neither required nor permitted.

*L.A. Gear,* 988 F.2d at 1122–23. Thus, design patent claims necessarily are limited.

The claim in the '023 patent is for "the ornamental design for a bag, as shown and described," and the pictures include six views of a shiny, stuffed bag which has jack-o-lantern faces on either side; while the patent never mentions color or size or material—despite standard ways to include such infor-

11. The *Lee* court found that the trial judge had not committed error by referring to a model rather than the depictions in the claims, stating as follows:

Mr. Lee argues that the district court erred in determining infringement by comparing the accused devices with a model of the patented devices, rather than solely with the drawing in the patent document. The court stated that it considered the devices in view of their overall effect, discussed the "principal differences between the plaintiff's patent D'142 and the alleged infringers", and appeared to attach weight to the patented design's showing of, and Lee's use of, fuzzy tennis balls as compared with the polished wood balls of the ac-

cused devices. The court remarked on its "visual inspection of the patented and alleged infringing devices".

The district court had before it models and drawings of all the devices, which enabled it to view the designs as a whole as required by law. *Gorham,* 81 U.S. (14 Wall.) at 530 [20 L.Ed. 731]; *Power Controls,* 806 F.2d at 239–40 ...; *see also In re Rubinfield,* 270 F.2d 391, 395, 123 USPQ 210, 214 (CCPA 1959), *cert. denied,* 362 U.S. 903, 80 S.Ct. 611, 4 L.Ed.2d 554 (1960) ("It has been consistently held for many years that it is the appearance of a design as a whole which is controlling in determining questions of patentability and infringement."). *Id.*

mation, *see* Manual of Patent Examining Procedures—the '023 claim accurately depicts the STUFF–A–PUMPKIN. In contrast, as testimony from defendant's expert in PTO procedures establishes, the drawings for the Sun Hill product would not have been acceptable renditions of the prior art. (*Tr.* at 215–16).

■ Bearing the above observations and standards in mind, this court now turns to the central issue of this suit: whether Fun World's pumpkin bag infringes the '023 patent. As noted in the earlier Memorandum and Order of this court, there is no question that PX 6A and PX 26A have a nearly identical overall appearance: both products are oversized and suitable for stuffing and displaying on a lawn; the lower portion of each pumpkin bag is tucked inward in order to take on a rounded shape when stuffed; both bags are formed of orange plastic; and both are imprinted with black graphics although the precise facial features differ. In sum, when used as intended, each product resembles a giant jack-o-lantern. While there are differences between the products—the features, the exact type of bottom tuck, and whether the bag has one or two faces—the similarities dominate. A consumer who was interested in purchasing a Halloween lawn bag would be unlikely to differentiate between the bags, as even defendant's principal Geller conceded:

> Q: Is it correct then that in your experience or your marketing judgment, the consumer when he sees one of these products, 26A, Sun Hill; 6A, yours, is looking for a large yard bag, plastic bag one can fill with leaves or newspaper, it becomes or looks like a jack-o-lantern and he's not concerned about the details of whether the triangle to the eyes are rounded or the mouth is rounded, or the triangles are upside down, or the nose is a little bit smaller; is that correct?

> A: It doesn't matter to him.... As long as it's attractive, I don't think it matters much.

(*Tr.* at 254–55). In sum, this court reaffirms the observation, made in its previous Memorandum and Order, that Sun Hill has proven infringement under *Gorham.*

With respect to the '023 patent's point of novelty, this court agrees with plaintiff that the design patent applies to the GIANT STUFF–A–PUMPKIN as an integrated and ornamental whole, for it is that whole—the ornamental gestalt—that is new, unique, and therefore worthy of protection. Furthermore, this court finds that the Fun World pumpkin leaf bag infringes what is contained and depicted in the '023 patent: a large orange lawn bag which, when stuffed, becomes a jack-o-lantern. Pumpkins—more precisely, jack-o-lanterns—have existed for quite some time; however, the melding of form to the function of the Sun Hill product is what makes that product special and unique from its predecessors. While it is clear that the function of a design patent should not dictate the design, it is equally true that design patents apply to articles of manufacture. This court accordingly rejects Fun World's argument that the "point of novelty" of the '023 patent is limited to the STUFF–A–PUMPKIN's graphics.[12] Defendant, after admitting to adapting its bag to resemble but not appropriate plaintiff's decorative invention, would have this court examine independently each aspect of the leaf bag, arguing that there is nothing unique or protectable in the orange color, the spherical shape, the z-lock bottom, the pumpkin theme, the leaf-bag idea. However, the law instructs that design patents are to be examined as a whole and that if the amalgam is new and unique—despite the components existing independently—that combination should be protected.

Nor does the fact that Fun World's product has only one face, no vertical lines, and a different bottom tuck alter this finding of infringement. The Court of Appeals for the

**12.** This court also finds unpersuasive the fact that in prior law suits Sun Hill claimed the bag's two faces as the product's point of novelty. (*Tr.* at 132–33). Since conceiving of the GIANT STUFF–A–PUMPKIN, Sun Hill has maintained

the view that the product's point of novelty is its overall appearance and has vigorously pursued manufacturers of one-faced bags to enjoin infringement of this novelty. (*Tr.* at 83–84, 133).

Federal Circuit has recognized the applicability of the doctrine of equivalents, embodied in the seminal case of *Graver Tank & Mfg. Co. v. Linde Air Products, Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950), to design patent cases, *Lee*, 838 F.2d at 1190, by reciting the following language:

"We are mindful of the oft-quoted words of the Supreme Court in *Graver Tank* ...:

One who seeks to pirate an invention, like one who seeks to pirate a copyrighted book or play, may be expected to introduce minor variations to conceal and shelter the piracy. Outright and forthright duplication is a dull and very rare type of infringement."

*Id. (quoting Schnadig Corp. v. Gianes Mfg. Co.*, 494 F.2d 383, 391–92 (6th Cir.1974)). Where a field is crowded with many references relating to the design of the same type of product, a court must construe the range of equivalents narrowly. *Litton Systems*, 728 F.2d at 1444. In this case, however, the field was wide open, and Sun Hill filled it. As testimony at trial revealed, Fun World imprinted various jack-o-lantern graphics on its bags in an attempt to circumvent the scope of the '023 patent. If this court were to find such variation sufficient to shield Fun World and other manufacturers from infringement suits, the '023 patent would lose its value and yet the competitors' products would make no contribution to the decorative arts. After hearing evidence in this case, this court is convinced that the one-sided bag is equivalent to the '023 patent; to find otherwise would be to exalt form over substance.

Finally, this court finds that defendant has failed to provide sufficient evidence supporting its counterclaims. In light of the above findings of fact and conclusions of law, those claims are accordingly dismissed.

### CONCLUSION

For the reasons described above, this court finds plaintiff's design patent No. Des. 310,-023 to be valid and infringed by defendant's product. The parties are ordered to contact the court to schedule a trial addressed to the issue of damages.

SO ORDERED.